J-S09041-15 & J-S09042-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE:  C.F., MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  G.M., BIRTH MOTHER | No. 1594 WDA 2014 |

Appeal from the Order entered September 2, 2014,
in the Court of Common Pleas of Allegheny County,
Orphans' Court, at No(s): TPR 075 of 2014

| | |
|---|---|
| IN RE:  L.F., MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  G.M., BIRTH MOTHER | No. 1714 WDA 2014 |

Appeal from the Order entered September 2, 2014,
in the Court of Common Pleas of Allegheny County,
Orphans' Court, at No(s): TPR 074 of 2014

| | |
|---|---|
| IN RE:  L.F., MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  E.J.F., FATHER | No. 1595 WDA 2014 |

Appeal from the Order entered September 2, 2014,
in the Court of Common Pleas of Allegheny County,
Orphans' Court, at No(s): TPR 074 of 2014

| | |
|---|---|
| IN RE:  C.F., MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  E.J.F., FATHER | No. 1715 WDA 2014 |

Appeal from the Order entered September 2, 2014,
in the Court of Common Pleas of Allegheny County,
Orphans' Court, at No(s): 75 of 2014

BEFORE:  FORD ELLIOTT, P.J.E., BOWES, and ALLEN, JJ.

MEMORANDUM BY ALLEN, J.:                    **FILED FEBRUARY 23, 2015**

G.M. ("Mother") and E.J.F. ("Father") appeal from the orders which granted the petitions of Allegheny County Children, Youth and Families ("CYF") to involuntarily terminate Mother and Father's parental rights to L.F. (born in January of 2000) and C.F. (born in June of 2004) (collectively "the Children"), and changed their permanency goals to adoption. We affirm.

The family became known to CYF in 2011 due to concerns regarding the parents' extreme hoarding and deplorable living conditions. Specifically, Animal Control had investigated a report that Mother was attacked by a dog in the family's home, and found six feet tall debris in the home and front porch, and the Children sleeping without beds amid debris on the living room floor.

On March 25, 2011, CYF went to meet with the family and could only open the front door six inches due to massive clutter obstructing the entrance. CYF could not get to the second floor of the home due to the collection of clothing at the base of the stairs. CYF reported that the living room was packed with clothing and family belongings piled approximately five feet high. The Children slept on mounds of debris in the living room. CYF also found that the home smelled of dog urine. CYF implemented a "safety plan" following their visit, with the Children to remain in the home under the care of C.L., ("Paternal Aunt"), and the parents to clear the debris from the home and make it safe. On April 21, 2011, CYF implemented in-home services through Family Group Decision Making, but found the parents

had made no progress in clearing the home. The home continued to be rife with piles of dirty clothing and mounds of personal items. CYF was unable to move throughout the home due to the excessive debris.

On May 19, 2011, CYF filed petitions for dependency relative to the Children. On June 7, 2011, the Children were adjudicated dependent, removed from their parents care and placed with Paternal Aunt. On August 25, 2011, a Family Service Plan ("FSP") was implemented for Mother and Father. Mother and Father's FSP goals were: (1) to clean and maintain a safe and livable home for the Children; (2) to meet and maintain basic financial demands of daily living; (3) to address mental health issues that lead to their hoarding; (4) to meet the medical and dental needs of the Children; (5) to visit the Children consistently; (6) to obtain and maintain jobs; and (7) to maintain contact with CYF caseworkers and providers. N.T., 8/27/14, at 111.

Thereafter, Mother and Father attended therapy with Dr. Lawrence Glanz, a psychologist who used Cognitive Behavioral Therapy to treat Mother and Father's compulsive hoarding. Dr. Glanz found it would take *at least* two years of continuous therapy to treat the parents' hoarding and for them to achieve a safe and livable home. Dr. Glanz recommended continued treatment, but Mother and Father abandoned the therapy.

In the meantime, the conditions in Paternal Aunt's home deteriorated due to Paternal Aunt's hoarding, and on September 4, 2013, the Children were placed with A.E. ("Foster Mother"), where they have remained.

On April 29, 2014, CYF filed termination petitions, seeking to terminate Mother and Father's parental rights to the Children pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b) of the Adoption Act. The trial court held hearings on August 27, 2014 and September 2, 2014. At the hearings, CYF presented the testimony of Stacey Good, a CYF caseworker; Dr. Lawrence M. Glanz, a licensed psychologist; Dr. Neil Rosenblum, a licensed psychologist; Foster Mother; Father; and Mother. By orders entered September 2, 2014, the trial court terminated Mother and Father's parental rights to the Children.

On October 1, 2014, Mother and Father filed notices of appeal, along with concise statements of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court consolidated the cases *sua sponte.*

Mother raises the following issues:

1. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden by clear and convincing evidence that involuntary termination of Mother's parental rights would best serve the needs and welfare of the Children pursuant to 23 Pa.C.S.A. § 2511(b)?

2. Did the trial court abuse its discretion in terminating Mother's parental rights when a more appropriate and less restrictive option of Subsidized Permanent Legal Custodianship ("SPLC") was available?

- 4 -

3. Did the trial court abuse its discretion in the consideration and weight given to the wishes of the [C]hildren?

Mother's Brief at 7.

Father raises the following issues:

1. Did the [t]rial [court] abuse its discretion and err in granting the Petition for Involuntary Termination of Parental Rights pursuant to 23 Pa.C.S.A. § 2511(b) of the Adoption Act?

2. Did the [t]rial [court] abuse its discretion and err in finding by clear and convincing evidence that the Children would not be adversely affected by severance of the strong bond extant between [Father] and [the C]hildren?

3. Did the [t]rial [court] abuse its discretion and err as a matter of law in determining that Foster Mother in this case (and adoptive resource) would permit post adoption contact between Father and [the C]hildren when Foster Mother had previously begun to limit all contact between Father and [the C]hildren?

4. Did the [t]rial [court] abuse its discretion and err as a matter of law in determining that the termination of parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), and (8) serves the needs and welfare of [the C]hildren?

5. Did the [t]rial [court] abuse its discretion and err as a matter of law in determining that there was clear and convincing evidence that termination of parental rights is in the best interest of the [C]hildren?

Father's Brief at 5.

We review the orders involuntarily terminating Mother and Father's

parental rights according to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the

findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, 36 A.3d [567,] 572 [(Pa. 2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id***.; ***see also Samuel Bassett v. Kia Motors America, Inc.***, 34 A.3d 1, 51 ([Pa.] 2011); ***Christianson v. Ely***, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id***.

As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 539 Pa. 161, 165, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826–827 (Pa. 2012).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants

- 6 -

> termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A. § 2511). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

This Court must agree with only one subsection of 23 Pa.C.S.A. § 2511(a), in addition to subsection 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In the instant case, Mother and Father do not challenge the trial court's analysis as it relates to their conduct under Section 2511(a); rather, Mother and Father focus their appellate argument on the trial court's analysis of the best interests of the Children under Section 2511(b). *See Krebs v. United Refining Co.*, 893 A.2d 776, 797 (Pa. Super. 2006); *Dietrich v. Dietrich*, 923 A.2d 461, 463 (Pa. Super. 2007).

Mother and Father assert that the trial court abused its discretion in concluding that termination of Mother and Father's parental rights would best serve the needs and welfare of the Children pursuant to 23 Pa.C.S.A. §

2511(b). Mother also argues that the trial court abused its discretion because the trial court did not consider the Children's wishes. Additionally, Father argues that the trial court abused its discretion in determining that Foster Mother would permit post-adoption contact with the Children because Foster Mother had previously begun to limit all contact between Father and the Children.

Section 2511(b) provides, in pertinent part:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b) (bold in original).

Pursuant to Section 2511(b), the trial court must take into account whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000) (*en banc*).

> In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." In addition, we instructed that the orphans' court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. Super. 2008).

- 8 -

While a parent's emotional bond with his or her child is a major aspect of the Subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010):

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted).

Here, the trial court found that the Children's best interests are served by termination of Mother and Father's parental rights. Trial Court Opinion "Exhibit A," 9/2/14, at 9. The trial court made the following findings of fact:

> This family has struggled with a dysfunctional family structure. In many respects [C.F.], the youngest child, was crippled with emotional dependency on [M]other and [F]ather.
>
> On the surface, [L.F.] appeared to be productive and resilient in her behavior. She is the healthiest functioning member of the family. However, [L.F.] has engaged in concerning behaviors such as cutting, and suicidal ideations, resulting in hospitalization and engagement in a partial hospitalization program. As it turns out she was NOT thriving; she was only surviving.

Trial Court Opinion, "Exhibit A," 9/2/14, at 8.

With respect to the Children in their foster home, the trial court found:

[C.F.] and [L.F.] are currently placed in an excellent foster home with [Foster Mother]. This is a pre-adoptive foster home. [Foster Mother] possesses an intuitive understanding of the children's needs and demonstrates an ability to help both [C.F.] and [L.F.] move forward in improving in their emotional adjustment and social development.

[C.F.] is now participating in several social programs that are clearly helping her build an improved self-concept and greater confidence in her ability to function independently. Both girls have made progress in their mental health functioning and personal adjustment, and are moving forward with their lives in an increasingly healthy and productive manner since being placed with [Foster Mother].

Trial Court Opinion, "Exhibit A," 1/3/14, at 8.

Regarding the Children's bond with Mother and Father, the trial court

found:

[The Children] love their parents and miss aspects of their former family life. However, [the Children] have now been removed from parents' care for more than three years and need an opportunity to move forward in their lives in a different direction. [The Children] have confidence in [F]oster [M]other. Birth parents do try to pull the girls back by reinforcing their desire to return home and be a family again. Yet on some level the girls, particularly [L.F.], seem to recognize that [M]other and [F]ather also hold them back from pursuing more age-appropriate experiences and accomplishments.

Given the current mental health status and dysfunction of parents, reunification is no longer a viable goal. Mother and Father are overwhelmed with too many psychiatric impairments and mental health concerns, making their ability to function as effective or suitable parents for the girls severely compromised. They have made limited progress in improving the physical conditions in their home that led to the girls' removal in the first place.

[The Children] would like to return to the care of their parents. If they cannot return, they wish to remain with [Foster Mother]. [L.F.] would prefer adoption as opposed to SPLC.

The real issue in this case is the needs and welfare of the [C]hildren. Admittedly, this is a difficult issue as we have two children who love their parents and wish to return to their care. We also have two parents who dearly love [the C]hildren and who have made [the C]hildren the focus of their lives.

However, [the Children] have been in care for more than [three] years and need permanence. For the first time in their lives, they are functioning normally. They live in a clean and safe home. The have friends and social lives. They now have a home where friends can visit. Their caregiver understands their bond with their parents and the importance of continued contact with their parents if the children are adopted by her.

Trial Court Opinion, "Exhibit A," 9/2/14, at 8.

Stacey Good, the CYF caseworker, stated, "there is no doubt that this family loves each other," and they "show a great deal of affection towards each other." N.T., 8/27/14, at 130-31. However, Ms. Good also testified that Mother and Father are not meeting any of the Children's educational, psychological, and developmental needs. *Id.* at 131. Ms. Good testified that the Children are very comfortable with Foster Mother, who is "willing to adopt." *Id.* at 130-131. Ms. Good testified that "the girls are in dire need of permanency. The girls have been left in care for 38 months, which has left their lives in limbo at this point." *Id*. at 132.

Furthermore, Dr. Rosenblum testified about the bond between Mother and Father and the Children. He testified:

The emotional connection to the parents is very strong. And in the past, their reliance on the parents to guide them and provide

safety and security for the Children was particularly strong, but as I've tried to explain, there are aspects of the bond and the attachment that are not healthy: Parents are overprotective parents. Parents are enmeshed. Parents had prevented the Children, you know, more so [C.F.] than [L.F.], from developing healthy self-esteem and a healthy sense of developmental maturation to the point that I believe that it has particularly affected [C.F.], and to some degree [L.F.] as well.

We have a reversal here, where [L.F.] in particular, had to worry about Mother and Father and not feel free to just focus on herself and her own personal needs. So she started stuffing those feelings and pretending to the outside world that she was fine, when in fact she was not fine. So there is a bond and there are aspects, as I said, in which these parents, they adore [the C]hildren and they live for [the C]hildren, but there are also a number of very unhealthy psychological aspects to their relationship.

The second part of the question, as I understand it is, how this will affect the Children if that relationship is changed, because I don't believe the bond is going to change. I think the relationship is going to change. The relationship has changed. The Children no longer depend on [Mother] and [Father] to be their primary people who they look to meet their needs. That has changed slowly with [C.F.] much more rapidly with [L.F.], who had a much easier time developing a good relationship with Foster Mother than [C.F.] did, because Foster Mother doesn't baby [C.F.] and Foster Mother has encouraged [C.F.] to develop her own sense of self-worth and her ability to feel good about herself, which I believe was long overdue.

Like I said, I think it will sadden the [Children] if termination is the outcome here or [when] the Court makes that decision. But I also believe that it will remove some things that are shackling the Children and troubling them, and that is the confusion of will they come back, will they not come back? How are Mother and [Father] doing? Are they stressed? Are they agonizing? Are they depressed? Are they anxious? And those are not good dimensions, developmentally. Those are not appropriate dimensions for the Children to have to deal with.

N.T., 8/27/14, at 77-90. *See In re T.S.M.*, 71 A.3d 251 (Pa. 2013) (stating that the strong parent-child bond was an unhealthy one that could not by itself serve as grounds to prolong foster care drift). We have stated that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition. *See In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008). This Court will not prolong instability for children when it is clear that their biological parents are unable to provide for their basic needs in the near future. *See In re T.S.M.,* 71 A.3d at 270.

Given the foregoing, we find that the trial court gave adequate consideration to the developmental, physical, and emotional needs of the Children in terminating Mother and Father's parental rights pursuant to section 2511(b), including consideration of the Children's wishes, and that the record supports the trial court's best interest analysis. *In re N.A.M.*, *supra*. We find no abuse of the trial court's discretion in terminating Mother and Father's parental rights to the Children pursuant to 23 Pa.C.S.A. §§ 2511(a) and (b).

Mother additionally argues that the trial court abused its discretion in terminating Mother's parental rights when a more appropriate and less restrictive option of a subsidized permanent legal custodianship ("SPLC") was available. Mother's Brief at 23. Mother observes that Dr. Rosenblum

considered a recommendation of SPLC, but rejected it in favor of adoption.

*Id.*

> Initially, our standard of review of an order regarding a placement goal of a dependent child is the abuse of discretion standard. In reviewing the court's denial of permanent legal custody, we are bound by the facts as found by the trial court unless they are not supported in the record. Once a child is adjudicated dependent, the court may order the family goal to be return home; it may terminate parental rights and place the child for adoption; or it may order the child be placed with a permanent legal custodian.

*In re S.B.*, 943 A.2d 973, 982 (2008) (citations and quotations omitted).

Section 6351(f.1) of the Juvenile Act lists the court's options in determining a dependent child's placement:

> **§ 6351. Disposition of dependent child**
>
> * * *
>
> **(f.1) Additional determination.**—Based upon the determination made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> (1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.
>
> (3) If and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the

safety, protection and physical, mental and moral welfare of the child.

(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5) If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and willing relative.

**(f.2) Evidence.**—Evidence of conduct by the parent that places the health, safety or welfare of the child at risk, including evidence of the use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk, shall be presented to the court by the county agency or any other party at any disposition or permanency hearing whether or not the conduct was the basis for the determination of dependency.

**(g) Court order.**—On the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1)(1)-(5), (f.2), (g).

SPLC transfers permanent legal custody to the dependent child's legal custodian without requiring the termination of natural parental rights. When deemed appropriate the [ ] court has the power to permit continued visitation by the dependent child's natural parents. To be eligible for SPLC, the legal custodian must meet all of the requirements for foster parenthood, submit to an annual eligibility evaluation, and have the ability to provide for the child without court supervision.

*In re B.S.*, 861 A.2d 974, 977 (Pa. Super. 2004). The court may consider permanent legal custody, upon the filing of a petition that alleges the dependent child's current placement is not safe, and the physical, mental, and moral welfare of the child would best be served if SPLC were granted. *Id.* Upon receipt of this petition, the court must conduct a hearing and make specific findings focusing on the best interests of the child. *Id.* The "court must find that neither reunification nor adoption is best suited to the child's safety, protection and physical, mental and moral welfare of the child" for the court to name the custodian a "permanent legal custodian." *Id.* (holding Section 6351(f.1) governs appointment of permanent legal custodian).

In the instant case, after more than three years of dependency, the trial court changed the family goal for the Children to adoption. The trial court found that reunification was no longer a viable goal due to the current mental health status and dysfunction of the parents. Trial Court, "Exhibit A," 9/2/14, at 9. The trial court found that Mother and Father are "overwhelmed with too many psychiatric impairments and mental health concerns, making their ability to function as effective or suitable parents for the [Children] severely compromised." *Id.* While the Children do love and wish to return to their parents, the trial court found that they are functioning normally for the first time in their lives. *Id.* The trial court stated that Foster Mother "understands [the Children's] bond with their parents and the

importance of continued contact with their parents, if the Children are adopted by her." *Id.*

> Dr. Rosenblum's recommendations were:
>
> Well, I really grappled with that and struggled with it.  On surfaces, I said many times, it is very difficult to make a recommendation that parents should lose their parental rights because of something like hoarding issues, you know.  Again, I have tried to amplify a lot of the psychological dimensions of neglect and a lot of the concerns I have about the type of relationship and over-connectedness and enmeshment within the family, but as an evaluator, we are more accustomed to, and I believe it is likely with the Court as well, more accustomed to people losing parental rights for violating the law, using drugs, physical abuse of children.  There was none of that within this family.  And so, I do recognize that on some level it seems severe for Mother and Father to lose their parental rights.  They are guilty perhaps of loving their children too much and not promoting a healthy psychological environment.  But it is tough to take that stand, but I don't believe that it is healthy for the Children to just continue living this way indefinitely, and, while I consider the permanency goal of SPLC, my concern was that it wouldn't—the same message that "you are going to be coming home soon."  We are rectifying this and the guilt induction, and the unhealthy dimensions of the relationship between parents and the girls would continue.
>
> And I believe there has always been a need for healthier boundaries, ***and I have difficulty believing that a goal of SPLC would give the Children the sense of closure and the sense of permanence that they need***.
>
> Even [C.F.] said because she knows she has a right to choose SPLC or adoption, . . . She is telling me she would choose adoption, because she doesn't want the Court to continue to be involved and I think as much as she loves her parents—excuse me—[L.F.] is ready to move on with her life and accept that this is probably what it is going to be.  And I think that is the issue that the Court should review in terms of making that decision, you know, ***what is going to be the permanency goal that gives the Children a clear message that their future is going in a certain direction as opposed to maintaining the***

> ***confusion, the anxiety, the doubt, and the worry, and been sort of the underlying sense of loss that the Children need closure, and in my opinion, it is likely that a goal of open adoption would give the Children a greater sense of certainty, a greater sense of finality***.

N.T., 8/27/14, at 71-73 (emphasis added).

> Dr. Rosenblum further testified:

> This is agonizing for everyone.  And it is like a slow death.  I said in my report an inevitable train wreck.   And there has been no ability of the parents to take control of their lives.   And the Children's lives have lost control.  As I said that was one of the reasons I believe that [L.F.] was cutting herself at one time. ***The Children need closure.  They need a definition of how their lives are going to proceed***.  And I think that there have been three years now that have gone by.  Or I know that three years have gone by without any improvement, without any clarity.

N.T., 8/27/14, at 75 (emphasis added).

Given the foregoing, we discern no abuse of discretion in the trial court's decision to forego the option of SPLC in favor of termination/adoption.

In a related claim, Father asserts that the trial court erred by finding that Foster Mother will allow post-termination contact between Children and the parents.  We initially note that we will not disturb factual findings that are supported by the record.  Here, Foster Mother testified that she would "absolutely" be willing to adopt the Children.  *Id*. at 37.  She also stated:

> There is no doubt in my mind that the girls need to have a relationship with their birth parents.  So I would absolutely be on board for an agreement to allow them to see their birth parents.

*Id*. at 37. Father's assertion regarding continued post-adoption parental contact with the Children is thus belied by the record.

Moreover, we recently determined that in termination proceedings, the termination analysis under 23 Pa.C.S.A. § 2511 may not be conflated with the Adoption Act and an adopting parent's willingness to enter into an agreement for continuing contact. ***In re K.H.B.***, --- A.3d ----, 2014 WL 7331022 (Pa. Super.).[1]

---

[1] Act 101, which pertains to adoption, states in relevant part:

**§ 2731. Purpose of subchapter.**

The purpose of this subchapter is to provide an option for adoptive parents and birth relatives to enter into a voluntary agreement for ongoing communication or contact that:

(1) is in the best interest of the child;

(2) recognizes the parties' interests and desires for ongoing communication or contact;

(3) is appropriate given the role of the parties in the child's life; and

(4) is subject to approval by the courts.

23 Pa.C.S.A. § 2731. An agreement under Act 101 "shall be filed with the court that finalizes the adoption of the child." 23 Pa.C.S.A. § 2735(a). The agreement shall not be legally enforceable unless approved by the court, which the court shall approve when the statutory conditions are satisfied. The statute by its plain language makes an agreement optional, and such agreement is plainly not required by Section 2511. When amendments were made to the Adoption Act in 2010, effective in 2011, a voluntary agreement for continued contact was not added to Chapter 25. Chapter 25 Proceedings Prior to Petition to Adopt remain separate from Chapter 27 Petition for Adoption. ***See*** 23 Pa. C.S.A. §§ 2511-2558; 23 Pa. C.S.A. §§ 2701-2742; ***In re K.H.B., supra.***

In sum, the trial court in this case conducted a thorough review, hearing from the parties, Foster Mother, and expert witnesses, considering SPLC as an option, but concluding that termination and adoption best suited the safety and protection, physical, mental and moral welfare of the Children. The trial court, consistent with 23 Pa.C.S.A. § 2511, determined:

> The circumstances that led to removal and placement of the [C]hildren continue. Although the agency is only required to make reasonable efforts to reunify children with their parents, in this case I find that Allegheny County OCYF has made EXTRAORDINARY EFFORTS in this case. Despite these extraordinary efforts, the parents have made no progress in this case. I find that continued services would not remedy the conditions the led to removal within a reasonable period of time, if ever.

Trial Court Opinion, "Exhibit A," 9/2/14, at 9. The trial court "also found that termination of [M]other and [F]ather's parental rights best served the needs and welfare of the [C]hildren." Trial Court Opinion, 11/5/14, at 5. The competent evidence in the record supports the trial court's determinations. Thus, we will not disturb them, and we affirm the trial court's orders. *See In re S.B.*, 943 A.2d at 982.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/23/2015

- 20 -